Filed 3/4/25  P. v. Giraldes CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LARRY GIRALDES, JR.,<br><br>    Defendant and Appellant. | H050697<br>(Santa Clara County<br>Super. Ct. No. 157274) |

In 1993, a jury found Larry Giraldes, Jr. guilty of various charges, including two counts of first degree murder (Pen. Code, § 187[1])[2], and also found true an enhancement that Giraldes had suffered a prior serious felony conviction (§ 667[3]).  The trial court sentenced Giraldes to a total term of 50 years to life in prison, consecutive to a determinate term of 12 years and four months in prison.  Giraldes appealed his convictions, and this court affirmed the judgment.  (*People v. Giraldes, et al.* (June 22,

---

[1] Although the complaint, information, and abstract of judgment do not specify a subdivision, we presume Giraldes was charged under subdivision (a) of this statute, which defines murder as the unlawful killing of a human being with malice aforethought.

[2] Undesignated statutory references are to the Penal Code.

[3] As no subdivision was specified in the operative pleadings, we presume this allegation was made pursuant to section 667, subdivision (a), which provides for longer punishments for persons convicted of a prior serious felony conviction.

1995, H011038) [nonpub. opn.] (*Giraldes, et al.*).) [4] The trial court later reduced both of Giraldes's convictions of first degree murder to second degree murder, and resentenced him to an indeterminate term of 30 years to life on those charges.

In 2021, Giraldes filed a petition requesting that his convictions for second degree murder be vacated and he be resentenced pursuant to former section 1170.95 (Stats. 2018, ch. 1015, § 4).[5] The trial court found that Giraldes had demonstrated a prima facie case for relief and issued an order to show cause pursuant to section 1172.6, subdivision (c). Following an evidentiary hearing on January 9, 2023, the trial court denied Giraldes's petition.

Giraldes now appeals the trial court's order, arguing that the trial court applied an incorrect legal standard in finding that he could still be found guilty under current law. For the reasons explained below, we will affirm the trial court's denial of the petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual Background*[6]

#### 1. *Chavez Auto Body Drug Operation*

Victims Alexander Fry and Peter Jouron were employees of Guillermo Chavez (hereafter Chavez), the leader of a drug ring selling high grade cocaine. Chavez's older

---

[4] On our own motion, we take judicial notice of the opinion in Case No. H011038, as well as the opinion in Giraldes's prior appeal from his first petition for resentencing in the same underlying trial court case, *People v. Giraldes* (Aug. 21, 2021, H047471) [nonpub. opn.] (*Giraldes*.). (Evid. Code, § 452, subd. (d)(1).)

[5] After Giraldes filed his petition, section 1170.95 was amended and renumbered as section 1172.6. (Stats. 2022, ch. 58, § 10, eff. June 30, 2022; see also Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022.) For ease of reference, we will refer to this statute by its current designation, section 1172.6.

[6] While the parties disputed what portions of the trial transcript were to be admitted at the evidentiary hearing, the trial court ultimately ruled that it would consider the entire trial transcript with certain limited exclusions of testimony that had since been called into question. Based on our review of the trial transcripts and exhibits admitted at Giraldes's section 1172.6 evidentiary hearing, we conclude they accord with the factual

brother, Robert Chavez, operated an auto repair shop, Chavez Auto Body.  Chavez used the repair shop as a front for his drug operations.  Fry and Jouron distributed cocaine and collected drug debts for Chavez.  Giraldes also worked for Chavez as one of his drug dealers, and lived in an apartment in Sunnyvale with brothers Rosario and Michael Grasso.  Another employee, Willie Lee Shackelford, acted as a "runner" for Giraldes, but also maintained legitimate employment at Empire Auto Sales, a used car dealership partly owned by Kourosh Saghafian, one of Giraldes's customers.

According to Chavez's employee Robert Lopez, tension began to develop between Chavez and the victims in September 1991.  Around this time, the victims approached Chavez for a loan of $10,000 to start their own methamphetamine business, which he refused.  The victims also could not deliver all the drug money owed by customers to Chavez, which angered him and made him suspect the victims were cheating him.  In particular, when Chavez began to receive complaints from his customers that his cocaine was diluted, he suspected the victims were responsible and confronted them, though they denied the accusations.

Saghafian testified that Giraldes similarly did not like the victims because they came around too often, interfered too much, and made threats.  Giraldes believed that the victims were going to "rip off" Chavez and take over the cocaine business.  Giraldes wanted to show Chavez that the victims were "doing [Chavez] wrong."  Giraldes told Saghafian that the victims had threatened him and that he wanted to get rid of them, and also told Saghafian that he would "move up one step" in the drug operation by cutting out

---

summary set out in our prior opinion in *Giraldes, et al., supra,* H011038 [nonpub. opn.].  Under these circumstances, we state the evidence presented at Giraldes's jury trial by reiterating most of the factual summary provided in that prior opinion, while including any additional information from the underlying trial transcripts relevant to Giraldes's involvement in the murders.  However, our analysis in this appeal solely relies on the underlying trial transcripts and exhibits. (Cf. *People v. Clements* (2022) 75 Cal.App.5th 276, 292–293. (*Clements*).)

the middleman. Saghafian further stated that during a telephone conversation he had with Giraldes on either October 11 or October 12 (shortly before the murders), Giraldes indicated that Jouron was coming over that night and that he (Giraldes) was going to put mercury in Jouron's drink.

### 2. *Events Prior to the Murders*

On October 10, 1991, a large collection of guns was stolen from a private collection owned by Robert Lindsey. Julio Santos, who was found in possession of two of the guns, later testified that he was offered money by Jouron to help Giraldes, the Grasso brothers, and an unidentified man remove a heavy box from a certain residence and load it into a black Camaro driven by Giraldes. The guns were ultimately taken to and unpacked at Giraldes's apartment. Jouron then let Santos pick some guns as payment for Santos's part in the burglary. Giraldes's acquaintances, Delores and James Harmon, testified that Giraldes subsequently brought some of the guns over to their home, which he stored in the Harmons' back bedroom.

Within the next day or two, Chavez received a telephone call at his auto shop. After Chavez hung up, he told his brother Robert Chavez and Robert Lopez (who testified as to these events) that the victims were setting him up for four kilos and were planning to kill him. Chavez said he was going to "get those mother fuckers and kill them." When Giraldes arrived at the shop two hours later, he told the Chavez brothers that the victims were plotting to take away Chavez's cocaine in a set-up. Robert Chavez told his brother "[w]ell, they're your friends, you brought them in, you take them out, you get rid of them." When Chavez confirmed that he was going to get the victims before they got him, Giraldes told Chavez he knew the victims were "gonna do that to you."

4

Gina Garcia, a close friend of both Giraldes and Shackelford, testified that she overheard Giraldes on the phone saying: "we have to get rid of these guys for [Chavez]."[7]

Lopez additionally testified that on Saturday evening (October 12), the victims delivered to Chavez most of the guns from the Lindsey burglary, which Chavez had bought from them. When the victims brought the guns to Chavez, Jouron asked Chavez if he was going with them to the hills to test the guns. Chavez first indicated that he would meet them there, and that the Grasso brothers and Giraldes would also be there, but later indicated that he "might not be able to make it." Chavez gave the victims some cocaine for their own use, telling them to "have a good time."

On the morning of October 13, 1991, Giraldes and Shackelford showed up at the Harmons' residence, walked into the back bedroom, and retrieved the guns that Giraldes had previously stored in the room's closet. According to Delores Harmon, Giraldes told her they were taking the guns from the residence because he didn't want the Harmons to "get involved" in anything. Witness Carlos Pereira, who was at the Harmons' residence at the time, testified that Giraldes and Shackelford "were wrapping [the guns] in a blanket and taking them to the car." Pereira heard Giraldes "talking about that we should get him in sun Crest and then we can hit 680 to 237 to 101." Shackelford and the Grasso brothers carried the guns from the Harmons' back room to Giraldes's car, at which point Giraldes removed one of the stolen guns, a .12-gauge shotgun, from his car and handed it to Mike Grasso. Pereira and Steve Nelson, another witness who was at the Harmons' home, both testified that Giraldes also had a smaller Uzi pistol and an Uzi assault rifle in his vehicle. Pereira and Nelson then heard Giraldes say that he had "put something in somebody's drink, and that if it worked, they wouldn't have to do it today."

---

[7] Garcia indicated that this took place shortly before the murders, but did not specify the exact day.

5

### 3. *Murders of Fry and Jouron*

On October 13, 1991, at approximately 7:35 p.m., San Jose police officers responded to reports of gunshots in the Alum Rock Park area in San Jose. Upon their arrival, the police discovered the dead bodies of Fry and Jouron, who were both seated in a Ford pickup truck belonging to Fry. Fry was in the driver's seat, while Jouron was in the passenger's seat. Fry had suffered gunshot wounds to his neck and ear from a .12-gauge shotgun and a nine-millimeter firearm. Jouron had two gunshot wounds to the head and neck from a .45-caliber firearm as well as a gunshot wound to the hip from a nine-millimeter firearm.

Two witnesses, Michele D., and Michael D[8]., were at Michael's house located near the parking lot where the murders took place. Michele first heard cars arrive at about 7:30 p.m., and within five to ten minutes, she heard sounds of multiple gunshots from different types of guns fire in rapid succession. She then heard cars speeding away. Michael called the police shortly thereafter.

When Michele and Michael came out of the house to see what was happening, they observed a white pickup truck rolling backwards slowly to a stop. A few minutes later, a white male in his early twenties walked down the hill and got into an older model maroon Monte Carlo with a white top, which then departed slowly with its headlights off. Minutes later, two white males walked down the same path as the other person and entered a silver and blue-striped Bronco that was parked about five feet from the original position of the pickup, which also left the scene at a normal speed.

Police recovered the following items from the scene: (1) expended shotgun pellets; (2) bullet fragments; (3) nine-millimeter hollow point silver tip ammunition; (4) Winchester nine-millimeter Luger casing; and (5) pieces of plastic from a shotgun shell.

---

[8] We refer to these witnesses by their first name and last initial only to protect personal privacy interests pursuant to California Rules of Court, rule 8.90(b)(10) & (11).

Police also discovered the barrel of an Uzi assault gun stamped "861" under the passenger seat of the pickup.

### 4. Events Following the Murders

On Monday, October 14, 1991, at 5:30 a.m., Giraldes, Shackelford, and Rosario Grasso went to an acquaintance, John DeRose's residence, where Shackelford told various persons in the home, including Garcia and DeRose, that they (Giraldes and Shackelford) had "just killed" the victims. Garcia testified that when DeRose indicated his disbelief, Giraldes told him to turn on the tv, which was airing a story about a double homicide in Alum Rock Park. According to Garcia, Giraldes said they killed the victims because it was "better them than us," while Shackelford said he drove the getaway car, a white Mustang, but "didn't pull the trigger." Shackelford indicated that Rosario Grasso used one gun, and Michael Grasso used the other gun, and Rosario Grasso confirmed he had blown Jouron's head off. Shackelford also told the people present that if anyone said anything, "he was going to shoot [them]."

Later the same day, Shackelford returned the Mustang—which he had borrowed from Saghafian's dealership—and narrated to Saghafian the details of the killings. Shackelford stated that Michael Grasso had shot Fry in the head with a shotgun; that Fry was the first one killed for Jouron to see what it was like; and Rosario Grasso killed Jouron. Shackelford also told Saghafian that Giraldes had fired the Uzi into Jouron's lap. Shackelford further informed Saghafian that the black Camaro was used during the actual killings and was switched out afterwards to the Mustang as the getaway car.

### 5. Giraldes's Arrest and Trial Testimony

On October 17, 1991, San Jose police officers arrested Giraldes in Sunnyvale. The following day, the officers searched Giraldes's Camaro, where they found a number of weapons, including the body of the Uzi assault rifle, which appeared to match the gun barrel previously found in Fry's pickup truck.

At trial, Giraldes testified in his defense and denied that he was involved in the murder, instead stating that he witnessed the Grasso brothers shoot both victims.[9] Giraldes said he did not know what to do because "everybody had guns, everybody was running around with a gun." He said he decided it was "best to get out of there as quickly as possible," so he got into the Mustang with Shackelford, and the two of them left. Giraldes indicated that the gun burglary from Lindsey's home was prearranged with Lindsey so that Lindsey could file an insurance claim for the loss. Giraldes testified that Lindsey "had priors" and had done similar fraudulent arrangements "three or four times."

## B.    Procedural History

### 1.    Charges, Verdict, and Original Sentence

On July 13, 1992, the Santa Clara County District Attorney filed a felony information against Giraldes and Shackelford, charging them with the murder of Fry (§ 187, count 1) and the murder of Jouron (§ 187, count 2). The information also charged Giraldes with possession of a deadly weapon by a felon (former § 12021, subd. (a)[10], count 3); first degree burglary (§ 459/460.1, count 4); and conspiracy to commit a crime, stemming from a later incident that occurred in June 1992 (§ 182.1, count 5). The information further alleged that Giraldes had previously been convicted of assault with a deadly weapon (§ 245), which constituted a serious felony within the meaning of section 667.

Giraldes and Shackelford were tried jointly for the murders of Fry and Jouron. At the conclusion of the trial, the jury was given instructions for a number of theories of guilt for the murders, including deliberate and premeditated killing, lying in wait, direct

---

[9] While the Grasso brothers testified at Giraldes's trial that they were not directly involved in the murders, they were later charged and convicted for perjury based on these statements and were also convicted for the same murders of Fry and Jouron.

[10] Former section 12021, subdivision (a) was renumbered as section 29800, subdivision (a)(1). (Stats. 2010, ch. 711, § 6.)

aiding and abetting, and murder as a natural and probable consequence of a conspiracy to distribute drugs. Both Giraldes and Shackelford were convicted of two counts of first degree murder (counts 1 and 2). Giraldes also was convicted of possession of a firearm by a felon (count 3); burglary (count 4); and conspiracy to escape (count 5). The trial court sentenced Giraldes to two consecutive indeterminate terms of 25 years to life on the two murder charges, and a determinate term of 12 years and four months on the remaining charges. Both Giraldes and Shackelford appealed, and this court affirmed Giraldes's and Shackelford's convictions in an opinion issued on June 22, 1995. (*Giraldes, et al., supra,* H011038) [nonpub. opn.].)

In 2014, the California Supreme Court held in *People v. Chiu* (2014)*,* 59 Cal.4th 155, superseded by statute as stated in *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1103, that a defendant cannot be convicted of first degree premeditated murder under the natural and probable consequences doctrine. Giraldes subsequently filed a petition for writ of habeas corpus in 2015 based on *Chiu*. The trial court granted Giraldes's petition in 2016, noting that it was not possible to determine from the record whether the jury had convicted Giraldes of first degree murder based on a valid theory, such as direct aiding and abetting, or the natural and probable consequences theory. The court reduced Giraldes's convictions to second degree murder and resentenced him to consecutive indeterminate terms of 15 years to life on those convictions.

### C. Section 1172.6 Proceedings

### 1. 2018 Petition for Resentencing

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) took effect on January 1, 2019, imposing a number of "statutory changes to more equitably sentence offenders in accordance with their involvement in homicides." (Stats. 2018, ch. 1015, § 1, subd. (b).) Senate Bill 1437 added what is now designated as section 1172.6, which allowed a person convicted in a case involving felony murder or murder under the natural

and probable consequences doctrine to file a petition with the sentencing court to vacate the conviction and to be resentenced.

In December 2018, Giraldes filed a petition for resentencing pursuant to Senate Bill 1437. The trial court denied his petition at the prima facie stage without issuing an order to show cause. The court found that Giraldes had failed to set forth sufficient facts supporting his contention that he could not be convicted of first or second degree murder under the current law. On appeal, a different panel of this court agreed that Giraldes had failed to meet his pleading burden under section 1172.6, but directed the trial court to grant him leave to file an amended petition. (*Giraldes, supra,* H047471 [nonpub. opn.].)

### 2. *2021 Petition for Resentencing*

On September 8, 2021, and September 27, 2021, Giraldes filed duplicate petitions for Senate Bill 1437 resentencing. After the People conceded that Giraldes had established a prima facie case for relief, the trial court issued an order to show cause and set the matter for an evidentiary hearing.

While neither party moved to admit any newly-acquired evidence at the evidentiary hearing, Giraldes's trial counsel objected to the admission of any evidence that had not been considered by the jury, including transcripts from the preliminary hearings and sentencing hearing, probation reports, and any documents in the court file that were not presented to the jury for consideration. In addition, counsel objected to the admission of certain trial testimony on the basis that it was "no longer admissible," including any hearsay statements made by Shackelford to others (such as Saghafian) shifting blame to Giraldes, since Shackelford was no longer a party to the proceedings. Moreover, counsel objected to the admission of testimony from the Grasso brothers based on their subsequent charges and convictions for perjury based on this testimony. At the evidentiary hearing, the trial court agreed to exclude the testimony of the Grasso brothers. The court overruled Giraldes's remaining objections and admitted the remainder of the

10

trial transcripts, including testimony regarding Shackelford's hearsay statements, as well as the preliminary hearing transcripts.

Both parties submitted written and oral argument on the evidence and issues presented. Giraldes's counsel argued that the People could not prove Giraldes was guilty of second degree murder beyond a reasonable doubt under current law because: (1) there was insufficient evidence to demonstrate that Giraldes acted with express malice—in other words, intentionally and willfully, or implied malice with a reckless disregard to life; and (2) there was insufficient evidence to support a theory of aiding and abetting, as nothing demonstrated Giraldes aided and abetted in an act so dangerous to human life that demonstrated implied malice.

In response, the People contended that there was substantial evidence demonstrating that Giraldes was involved in the planning and execution of the murders, and Giraldes's testimony to the contrary was not credible. The People further argued that Giraldes's actions before, during, and after the murders demonstrated beyond a reasonable doubt that he acted with malice in planning, aiding, and abetting in the murders.

On January 9, 2023, after hearing final argument from the parties, the trial court found that the People had proven beyond a reasonable doubt that Giraldes was guilty of murder. The trial court noted that in making its decision, it had thoroughly reviewed the trial transcripts and other hearing transcripts, the "extensive briefing" from the parties, and the points raised in the parties' oral arguments. When Giraldes's counsel asked the court for further explanation or reasoning behind its decision, the trial court responded as follows:

"[W]hat 1172.6 requires is simply that determination that I just put forth. … It talks about in other parts, for example, of the order to show cause that it needs to be … In 1172.6(c) it says if the Court declines to make an order to show cause it shall provide a statement fully setting forth its reasons for doing so. That's not what is implicated here or at issue

11

here. This is the ultimate ruling.  I—in thinking about it, I think this is—this part of the procedure and determination is very much akin to what a jury would do.  A jury is not called on to say what theory it decides on, what evidence it relied on.  I think I have been transparent about what I have considered, and reviewed, and relied on, and the arguments that I've considered from counsel. Overall, it is a determination of whether or not the Prosecution carries its burden of proof to prove beyond a reasonable doubt that Mr. Giraldes was—is guilty of the murders that happened those more than 30 years ago.  I've spoken to the challenges and credibility determinations.  I will say that I did not find Mr. Giraldes's testimony credible at trial.  And that certainly had a role in—and certainly not, by any means, the sole factor.  But I will mention that as one factor that I considered. But, beyond that, I don't think that the Court is—I don't think the statute calls upon the Court to delve into the reasons for the determination, the ruling anything beyond what I've already put on the record."

Giraldes timely appealed.

## II.    DISCUSSION

### A.    *Legal Principles and Standard of Review*

As noted above, effective January 1, 2019, Senate Bill 1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  To that end, the bill amended section 188, subdivision (a)(3), which now requires that all principals must act with express or implied malice to be convicted of the crime of murder, with the exception of felony murder under section 189, subdivision (e). (Stats. 2018, ch. 1015, § 2.)  A felony murder conviction under section 189, subdivision (e), as amended by Senate Bill 1437, requires that the defendant be the actual killer, an aider and abettor to

12

the murder who acted with intent to kill, or a major participant in the underlying felony who acted with reckless indifference to human life. (Stats. 2018, ch. 1015, § 3.)

In addition to the amendments to sections 188 and 189 described above, Senate Bill 1437 added what is now section 1172.6. (Stats. 2018, ch. 1015, § 4; Stats. 2022, ch. 58, § 10.) As relevant here, section 1172.6 allows a person convicted of murder under prior law to petition the court to vacate their conviction and be resentenced on any remaining counts. (§ 1172.6, subd. (a).) All of the following conditions must apply to warrant section 1172.6 relief: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine[,] or other theory under which malice is imputed to a person based solely on that person's participation in a crime….[¶] (2) The petitioner was convicted of murder . . . following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder….[¶] (3) The petitioner could not presently be convicted of murder . . . because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a).)

Upon "a prima facie showing of entitlement to relief under [former] section 1170.95, subdivision (a), the petitioner is entitled to receive 'a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not been previously . . . sentenced.' " (*People v. Sanchez* (2020) 48 Cal.App.5th 914, 917.) At this hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended . . . If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).) The trial court may rely on "evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and

matters judicially noticed.  The court may also consider the procedural history of the case recited in any prior appellate opinion." (*Ibid.*)

"Ordinarily, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence.  [Citations.]" (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) Thus, we examine the entire "record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*Ibid.*)  We review the "application of [that evidence] to the statute de novo.  [Citation.]" (*People v. Silva* (2023) 87 Cal.App.5th 632, 639.)  That the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment.  (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071 [defendant on substantial evidence review "bears an 'enormous burden' "].)

However, "where there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently." (*Reyes, supra,* 14 Cal.5th at p. 988.)  In the instant matter, because Giraldes claims that the trial court misunderstood the elements of aider and abettor liability for murder, we shall examine that issue independently.

### B.      *Theories for Liability for Second Degree Murder*

"Second degree murder is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]  Malice may be either express, i.e., when a defendant manifests an intention to kill, or implied. [Citation.]  " 'Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " ' [Citation.]  Thus, implied malice includes an

14

objective component—an act that is dangerous to life—and a subjective component—the defendant's awareness of and disregard for the danger." (*Clements*, *supra*, 75 Cal.App.5th at p. 299.) Intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

A person can be convicted of aiding and abetting second degree murder based on implied malice. (*Reyes*, *supra*, 14 Cal.5th at p. 990; *People v. Gentile* (2020) 10 Cal.5th 830, 850 [" '[N]otwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.' "].)

"In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life.' [Citation.]" (*Reyes, supra,* 14 Cal.5th at p. 991.)

### C. *The Record Does Not Reflect the Trial Court Misunderstood or Misapplied the Legal Standard for Direct Aider and Abettor Liability*

Giraldes argues that for the court to have found him liable for murder under a valid theory that had not been abrogated by Senate Bill 1437, it would either have to find that he personally committed the murders, or that he directly aided and abetted the actual perpetrators in the shootings. Giraldes claims that the legal standard set forth in *Reyes,* which was decided after his evidentiary hearing, changed the requirements for aider and

15

abettor liability, thus making it "uncertain" if the court understood the standard correctly. Giraldes therefore argues that under *Reyes*, the trial court would have had to find him "directly involved" in the shootings to find him liable under an aider and abettor theory, which is not apparent from the record given the conflicting evidence presented and the court's lack of explanation for its ruling.

In response, the Attorney General contends that the court's order did not reflect a misunderstanding of the requirements for aider and abettor liability because the standard delineated in *Reyes* was not a new one, but merely a reiteration of an existing standard. The Attorney General further notes that the elements of aider and abettor liability for implied malice murder, as set forth in *Reyes*, were quoted directly from the appellate opinion in *People v. Powell* (2021) 63 Cal.App.5th 689. In addition, the Attorney General argues that both Giraldes and the People cited *Powell* in their briefings to the trial court as setting forth the applicable legal standard for aider and abettor liability in an implied malice murder; accordingly, it should be presumed the trial court applied the correct legal standard.

In reviewing the record, we acknowledge that the court did not specify what legal theory it was relying on in reaching its conclusion. However, as the court correctly noted, section 1172.6 does not require the trial court to provide a statement of its reasoning following an evidentiary hearing.[11] In addition, in the absence of any evidence to the contrary, a court is presumed to have applied the correct legal standard. (See *People v. Thomas* (2011) 52 Cal.4th 336, 361.) Indeed, we agree with the Attorney General that the record demonstrated the trial court was aware of the correct standard, as the court indicated on numerous occasions that in order to determine whether Giraldes could still be found guilty beyond a reasonable doubt of second degree murder, it was

---

[11] A statement of decision is only required where the trial court declines to issue an order to show cause on a petition for resentencing. (§ 1172.6, subd. (c).)

16

required to find express or implied malice, and that Giraldes was either a shooter or otherwise aided and abetted the shootings.  While the trial court did not specify which of these theories it was relying on in making its ruling, it indicated it had read the parties' briefs, which – as the Attorney General notes—discussed the same legal standard for aider and abettor liability as delineated in *Powell* and reiterated in *Reyes*.  Further, as the Attorney General correctly indicates, *Reyes* quoted *Powell* to outline the direct aiding and abetting standard, and both parties' briefs to the trial court discussed the standard set forth in *Powell*.  Accordingly, we find no basis to conclude that the court's silence as to its chosen theory reflected a misunderstanding or misinterpretation of the applicable legal standard.

Giraldes's argument primarily rests upon an issue of fact, namely, whether the evidence as presented supported a theory of aider and abettor liability for implied malice murder.  We therefore shall review the trial court's denial of Giraldes's petition for substantial evidence.

### D.      *Substantial Evidence Supported Giraldes's Liability for Murder Either as a Direct Perpetrator or a Direct Aider and Abettor*

As the parties' initial briefs primarily focused on the trial court's understanding of the applicable legal standard, we requested supplemental briefing on the issue of whether substantial evidence supported the trial court's finding that Giraldes was guilty beyond a reasonable doubt for second degree murder under current law, either as a direct perpetrator or an aider or abettor.

In his supplemental briefing, Giraldes claims that because the trial court did not make any factual findings or credibility determinations in making its ruling, its final decision should not be reviewed for substantial evidence.  Instead, Giraldes argues that the whole record must be examined without the deference traditionally afforded to the trial court when conducting substantial evidence review.  However, as noted above, section 1172.6 does not require the trial court to provide a statement of its reasoning

17

following an evidentiary hearing. Further, Giraldes cites no legal authority, nor are we aware of any, indicating that the standard of review following the denial of a section 1172.6 petition changes depending on the level of detail provided in a lower court's decision. (See, e.g., *People v. Davis* (2024) 107 Cal.App.5th 500, 511 [noting that "[t]he court was not required to describe every piece of evidence in making its ruling, and we will not presume the court failed to consider the evidence presented"].) Accordingly, we find no merit to Giraldes's contention that the standard of review in the instant matter should differ from than the substantial evidence standard, as described above.

Giraldes next contends that because it was undisputed that the Grasso brothers fired the fatal shots that killed the victims, the primary question was whether the remaining non-fatal shots were attributable to either Giraldes or Chavez, who later admitted to the murders. Giraldes argues that there is nothing in the record demonstrating that the evidence presented as to his culpability was more credible than the evidence presented as to Chavez's culpability. Giraldes further asserts that the "star" prosecution witnesses, Garcia and Saghafian, were not credible and presented contradictory stories. Lastly, Giraldes claims that there was uncontroverted evidence that demonstrates more "credence" to a theory that Chavez, not Giraldes, was the third shooter, such as evidence that the eyewitnesses at the scene saw a car "similar" to one owned by Chavez leaving the scene, as well as Chavez's statements prior to the murders that he planned to kill Fry and Jouron after learning of their intentions to take over his drug business.

In reviewing whether there was substantial evidence to support a trial court's denial of a section 1172.6 petition, " ' " '[w]e resolve neither credibility issues nor evidentiary conflicts . . . .' [Citation.]" [Citation.]' [Citation.]" (*People v. Schell* (2022) 84 Cal.App.5th 437, 442.) " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the

18

facts upon which a determination depends' [Citation] … A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the [fact finder]'s verdict. [Citation]." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Accordingly, given that much of Giraldes's arguments rests on the credibility of the witness testimony presented, or conflicts in evidence, it was the role of the factfinder—here, the trial court—to resolve such issues, and these determinations shall not be disturbed on appeal.

Although the court did not specify what theory of liability it relied on, for the reasons explained below, we find that there was substantial evidence to demonstrate that the prosecution proved beyond a reasonable doubt that Giraldes was guilty of second degree murder as either a direct perpetrator or a direct aider and abettor.

### 1. *Giraldes as a Direct Perpetrator of Implied Malice Murder*

As stated above, second degree murder requires the unlawful killing of another human being with malice aforethought. (See *Clements*, *supra*, 75 Cal.App.5th at p. 299.) " ' "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " ' [Citation.]" (*Ibid.*) For the life-endangering act to be the proximate cause of a victim's death, the act must have been " ' "a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

In the instant case, there was substantial evidence that Giraldes deliberately engaged in a life-threatening act with full knowledge of the danger to, and with conscious disregard, for the victims' lives. Per Shackelford's recounting of the murders to Saghafian, Giraldes fired a shot directly into Jouron's lap and police testimony later confirmed that the barrel of the Uzi gun found in the passenger seat of the pickup truck—where Jouron was seated at the time of the murder—matched the Uzi

19

assault rifle body located in Giraldes's vehicle.[12] Witnesses also testified that Giraldes was motivated and actively involved in the planning and preparation of the murders, which included his conversations with Chavez about the victims' plans to take over the drug business, stealing the guns from Lindsey's residence and retrieving them from the Harmons' residence on the morning of the murder. Further, witnesses testified about Giraldes's dislike of the victims and desire to eliminate them in the Chavez drug operation so he could move up in the business, as well as a phone conversation where he indicated that "we need to get rid of these guys for [Chavez.]" Accordingly, based upon admitted evidence, a trier of fact could reasonably conclude that: (1) Giraldes deliberately shot Jouron (who was sitting directly next to Fry); (2) in so doing, Giraldes's intent was to commit a life-endangering act with conscious disregard for the victims' lives; and (3) that act proximately caused their deaths.

### 2. Giraldes as an Aider and Abettor of Implied Malice Murder

As discussed above, to be liable for implied malice murder under a theory of aiding and abetting, the aider and abettor must not only engage in words or conduct that aid the commission of a life-endangering act, but must act with the " 'knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life.' [Citation.]". (See *Reyes, supra,* 14 Cal.App.5th at p. 991.)

In the instant matter, we find substantial evidence that Giraldes not only engaged in conduct that aided in the commission of the life-endangering act, namely, the fatal shooting of Fry and Jouron, but also demonstrated the requisite mental state as required

---

[12] While Giraldes argues that the bullets recovered from the victims could not be matched to the Uzi barrel, the expert witness testified that an Uzi barrel can be changed within a few seconds, and that replacement barrels are readily available. Accordingly, the court could have reasonably inferred that a different barrel had been used during the shooting, particularly given that the Uzi barrel found on the scene was located in the pickup truck and not with the Uzi rifle body later found in Giraldes's possession.

by *Reyes*. Witnesses testified that Giraldes took an active role in planning and preparing the murders and was actually present on the scene during the shooting. The collective testimony of Santos, Nelson, Pereira, and the Harmons affirmatively demonstrated that Giraldes was involved in the theft of guns from Lindsey's home—some of which he stored temporarily at the Harmons' home—and he retrieved those same guns, including a .12-gauge shotgun (which he gave to Michael Grasso), the Uzi pistol, and the Uzi assault rifle, on the morning of the murder. Moreover, there was testimony that Giraldes himself fired into Jouron's lap during the course of the shootings. Accordingly, we find that a reasonable factfinder could conclude that Giraldes's statements and actions before and during the murders cumulatively served to assist the direct perpetrators in the commission of the life-threatening acts, namely, the fatal shootings of Fry and Jouron.

In addition, there was substantial evidence presented through the testimony from Saghafian, Lopez, and Garcia, indicating that Giraldes wanted to get rid of the victims so that he could move up in Chavez's business—or, at a minimum, prevent them from taking over Chavez's business and killing Chavez. Although motive is not required to be proven or sufficient alone to establish culpability for these crimes, a reasonable factfinder could conclude that Giraldes not only had a strong motive to get rid of Fry and Jouron, but he also clearly intended to kill or harm them, either through his own actions or by helping Chavez in his plans to kill them.

The record reflects that the only evidence offered by Giraldes indicating that he was not involved in the shootings was his own testimony that he merely witnessed them. The trial court, within its role as the factfinder, expressly stated that it did not find this testimony credible. Accordingly, even assuming that Giraldes was not the actual perpetrator who committed the life-endangering act—namely, the fatal shootings of Jouron and Fry, a reasonable factfinder could conclude that Giraldes's cumulative words, conduct, and actions—as detailed above—demonstrated that he not only aided in the commission of this life-endangering act, but acted with the knowledge that the direct

21

perpetrators intended to kill the victims, harbored the same intent, and acted not only knowing that this act was dangerous to human life, but with conscious disregard for such life.

We therefore conclude that substantial evidence supports the trial court's decision that the prosecution proved beyond a reasonable doubt that Giraldes was guilty of the second degree murders of Fry and Jouron.

### E.    Consideration of Giraldes's Youth

Giraldes finally argues that that remand for a rehearing is required because the trial court failed to consider his youth at the time of the offense when determining whether he harbored the appropriate mental state for express or implied malice, as required under *People v. Pittman* (2023) 96 Cal.App.5th 400 (*Pittman*).  The Attorney General contends that because Giraldes failed to raise any objections on this issue in the trial court, he has forfeited his right to raise it on appeal.

While Giraldes's trial counsel did mention in his trial briefing that Giraldes's youth was a factor that should be considered in determining whether he acted with malice—namely, whether he "subjectively appreciated the danger" of his actions, this argument was not raised or mentioned again during the course of the evidentiary hearing, including when the trial court rendered its final decision on Giraldes's petition. "Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal." (*In re Sheena K.* (2007) 40 Cal. 4th 875, 880.)[13] We therefore conclude that Giraldes has forfeited this issue.

_____

[13] In his reply brief, Giraldes argues that because *Pittman* did not find forfeiture, despite trial counsel's failure to raise the issue of defendant's youth in the trial court, he was not required to object in the trial court to preserve this issue on appeal.  However, the court in *Pittman* concluded that there was no forfeiture on appeal because the defendant's petition was denied in 2020, and "[t]he relevant appellate cases [deciding that youth is a relevant factor bearing on mental state in section 1172.6 petitions] were not decided until 2021 or later." (*Pittman, supra*, 96 Cal.App.5th at p. 416.)  As all of these cases were

22

Moreover, even if we were to find that the issue was not forfeited, Giraldes fails to provide any pertinent facts and citations to the record demonstrating his youth should have been considered in evaluating whether he harbored the appropriate mental state for the offense.  In contrast, the *Pittman* court's decision to remand for consideration of the defendant's youth was specifically based on the circumstances of the crime.  (*Pittman*, *supra*, 96 Cal.App.5th at p. 418.)  Because Giraldes has failed to establish prejudicial error on this point, we reject his argument.  (See *People v. Picazo* (2022) 84 Cal.App.5th 778, 802 [judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error].)

### III.    DISPOSITION

The order denying Giraldes's Penal Code section 1172.6 petition is affirmed.

---

decided prior to Giraldes's evidentiary hearing, Giraldes had substantial notice of the issue prior to his hearing and the reasons the *Pittman* court gave for finding no forfeiture are not present.

23

_____
                                          Wilson, J.

WE CONCUR:

_____
         Bamattre-Manoukian, Acting P. J.

_____
                 Danner, J.

*People v. Giraldes*
H050697